IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**J.D., a Protected Individual,**
**Appellant Below, Petitioner**

**FILED**
**December 23, 2024**
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**v.) No. 24-ICA-88**      (Bd. of Review No. 23-BOR-3276)

**WEST VIRGINIA DEPARTMENT OF HUMAN SERVICES,**
**BUREAU FOR MEDICAL SERVICES,**
**Respondent Below, Respondent**

**MEMORANDUM DECISION**

Petitioner J.D.[1] appeals the January 31, 2024, decision of the Board of Review ("Board") for the Bureau for Medical Services ("BMS"), an agency of the West Virginia Department of Human Services. BMS filed a response.[2] J.D. filed a reply.

The issue on appeal is whether the Board erred in affirming the decision of BMS which denied J.D.'s application for services through its Intellectual and Developmental Disabilities Waiver program ("IDDW"). The Board found that J.D.'s application did not establish that he had a severe diagnosis of an intellectual disability or related condition. J.D. now appeals that decision.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds that there is error in the Board's decision. Accordingly, a memorandum decision reversing, vacating, and remanding that decision is appropriate under the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure.

It is undisputed that J.D. is a minor who has intellectual limitations. In 2023, J.D.'s mother applied for benefits and services through IDDW on his behalf. IDDW is a state-federal partnership, which provides services to adults and children with disabilities to help

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[2] J.D. is represented by Patricia J. DiFranco, Esq., and Jacqueline M. Schwaben, Esq. BMS is represented by Patrick Morrisey, Esq., and Gary L. Michels, Esq.

1

teach, train, support, guide, and assist individuals reach the highest level of independence in their lives.

IDDW is governed by Chapter 513 of the BMS Provider Manual. *See* BMS Provider Manual, Chapter 513 Intellectual and Developmental Disabilities Waiver (IDDW*)* (2023) ("Chapter 513").[3] Section six of this Chapter contains the IDDW's policy regarding eligibility and enrollment. For the purposes of this appeal, we highlight the following relevant provisions.

First, Chapter 513 § 513.6.2 (2023) states that in order to be eligible for IDDW, an applicant must meet the medical eligibility criteria in each of the following categories: diagnosis, functionality, need for active treatment, and requirement of ICF/IID level of care. Central to this case is the diagnosis category and on that issue Chapter 513 § 513.6.2.1 (2023) sets forth the required diagnosis criteria which states, in part:

> The applicant must have a diagnosis of intellectual disability with concurrent substantial deficits manifested prior to age 22 **or** a related condition which constitutes a severe and chronic disability with concurrent substantial deficits manifested prior to age 22.
>
> Examples of related conditions which may, if severe and chronic in nature, make an individual eligible for the IDDW Program include but are not limited to, the following:
>
> - Autism;
> - Traumatic brain injury;
> - Cerebral Palsy;
> - Spina Bifida; and
> - Any condition, other than mental illness, found to be closely related to intellectual disabilities because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of intellectually disabled persons, and requires services similar to those required for persons with intellectual disabilities.

---

[3] We cite to the version of Chapter 513 which became effective December 21, 2023, as it was in force at the time of the Board's decision. However, as part of this appeal, we have also reviewed these same provisions as they are set forth in the present version of Chapter 513, effective September 25, 2024, and prior version dated April 1, 2021. These versions cover the entire timeline of this case. From that review, we have determined that throughout these versions, the language of these controlling policy provisions is substantively unchanged.

As part of his IDDW application, J.D. underwent an Independent Psychological Evaluation ("IPE") with a licensed psychologist on July 5, 2023, who issued a written report on July 17, 2023 ("IPE-1"). IPE-1 found that J.D. was a tenth-grade student with a very low IQ and intellectual functioning between the second and fourth grade levels. He exhibited severe autism symptoms and displays developmental delays with deficits in his motor skills, communication skills, and adaptive behavior skills.

IPE-1 diagnosed J.D. with Level 2 Autism Spectrum Disorder[4] and Borderline Intellectual Functioning. Upon the psychologist's clinical observations and review of J.D.'s clinical testing data, IPE-1 included several recommendations. For example, it was determined that J.D. would benefit from speech and occupational therapy. Also, J.D.'s prognosis was noted as fair with intervention but poor without intervention. J.D.'s testing results were found to be consistent with psychological evaluations he had undergone in the past. These findings and recommendations were all within a reasonable degree of psychological certainty.

By notice of decision dated July 21, 2023, BMS denied J.D.'s application. As basis for the denial, the decision noted: "Documentation submitted for review does not support the presence of an eligible diagnosis for the I/DD Waiver Program of intellectual disability or a related condition which is severe." The decision further noted that, "[s]pecifically, the documentation failed to demonstrate substantial limitations in the following major life areas: Self-Care, Learning, Self-Direction, Receptive or Expressive Language, Mobility, and Capacity for Independent Living." BMS' decision was issued on a standard form used by the agency and these "major life areas" are each listed next to individual check boxes. For the July 21, 2023, decision, BMS checked all of the boxes for the listed major life areas for which it determined there was not sufficient documentation. The decision also stated that J.D. had the right to request a second IPE with another licensed psychologist, which would be paid for by BMS. J.D.'s mother exercised this right, and she chose a psychologist from a BMS-approved list.

A second IPE was completed, and a report was issued on August 28, 2023 ("IPE-2"). According to IPE-2, the evaluating psychologist did not perform independent testing, but rather, incorporated the testing results from IPE-1. Under IPE-2, J.D. was diagnosed with Autism Spectrum Disorder (Level 2) Requiring Substantial Support; Unspecified Anxiety Disorder, and Borderline Intellectual Functioning. IPE-2 recommended that J.D. explore community services and interventions. It gave a prognosis of fair with behavioral interventions and intensive skill training but found that J.D. "will likely require a high level of support for the foreseeable future to ensure his needs are met."

---

[4] Autism Spectrum Disorder is the current nomenclature used by the American Psychiatry Association, but it is also referred to as Autism throughout the record.

On September 25, 2023, J.D.'s IDDW application was denied for a second time. In this decision, BMS again indicated that: "Documentation submitted for review does not indicate an eligible diagnosis of Intellectual Disability or a Related Condition which is severe." Notably, however, this decision did not mark any of the designated "major life areas" to establish what the documentation failed to establish. Following this denial, J.D.'s mother filed an appeal on October 19, 2023, seeking an administrative hearing to challenge the September 25, 2023, decision.

An administrative hearing was held before the Board on January 11, 2024, and January 18, 2024. Both parties appeared with counsel. BMS called its psychological consultant, Kerri Linton, and J.D.'s witnesses included his mother, and Joseph Scotti, Ph.D., a licensed clinical psychologist.

On January 31, 2024, the Board issued its decision. The decision contains a generalized summary of the testimony of J.D.'s witnesses, Dr. Scotti, and J.D.'s mother. However, the Board's decision placed considerable emphasis on the testimony of Kerri Linton, BMS' consulting psychologist.

Ms. Linton is the owner of Psychological Consultation and Assessment, which BMS has contracted as its Medical Eligibility Contracted Agent ("MECA") to provide quality assurance, secondary reviews, and expert testimony in administrative hearings since IDDW's inception in 1985. Ms. Linton testified that J.D. did not qualify for IDDW because his Level 2 Autism Spectrum Disorder diagnosis did not meet the severity required to qualify as a related condition under Chapter 513. According to Ms. Linton, a Level 3 diagnosis was required, and his additional diagnoses of Borderline Intellectual Functioning and Unspecified Anxiety Disorder are not equivalent to an intellectual disability for IDDW eligibility purposes. She indicated that a Level 3 diagnosis is not currently required by policy. However, she stated that based upon current research, she believed a Level 3 severity was necessary to meet the severity level intended for IDDW and that this opinion was "gaining traction" diagnostically. As a result, she stated that BMS[5] has proposed a new policy, which is pending approval before the Centers for Medicare and Medicaid Services ("CMS").[6] During the administrative hearing, Ms. Linton testified on this issue as follows:

> So, this present policy does not reflect the current nomenclature that we're using for autism spectrum disorder. We have a policy that's currently in-in

---

[5] In her testimony, Ms. Linton states, "*we* have a policy that's currently . . . in process before CMS[.]" (emphasis added). While it is unclear to whom the pronoun "we" was referring, based upon review of her whole testimony, it is reasonable to presume that Ms. Linton was referring to BMS.

[6] CMS is the federal agency that administers the Medicare and Medicaid programs, and it must approve any state-level changes to IDDW programs.

process before CMS to be approved that will specify autism spectrum disorder level 3. In the interim, we've been tasked with defending why autism spectrum disorder level 3 meets the eligibility criteria for a severe related condition and why levels 1 and 2 do not meet the criteria. And essentially in our research, autism level 3 is most often associated with concurrent intellectual disability and substantial adaptive deficits. Moving even further down the line into recent research, we're really looking at a profound autism, which is something that I think is gaining some traction from a diagnostic standpoint. So, this is for individuals that have significant symptoms of autism, usually are nonverbal, and have that co-occurring intellectual disability. So, for eligibility purposes, a related condition, which is severe under the heading of an autism spectrum disorder, must be diagnosed at level 3. And in the case of [J.D.], we've had two evaluations in 2023 that both diagnosed autism spectrum disorder level 2. Also, under the Intellectual Disability header, before I move forward, he's also been diagnosed with borderline intellectual functioning, and borderline intellectual functioning is not equivalent to an intellectual disability. So, neither of those diagnoses, nor the unspecified anxiety disorder, which was added in the second medical, which would fall under the category of a mental health condition, none of those three diagnoses meet eligibility criteria for a severe related condition.

Thereafter, the Board made the following conclusions of law:

1) Policy requires that an individual must meet the medical eligibility criteria of a diagnosis of Intellectual Disability or related condition, which constitutes a severe and chronic disability that manifested prior to age 22.

2) The Appellant was diagnosed with Autism Spectrum Disorder, Level 2, which does not meet the severity criteria in policy.

3) The Appellant failed to meet the diagnostic criteria threshold for services under the [IDDW] program.

This appeal followed.

In this appeal, we apply the following standard of review:

The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

5

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority or jurisdiction of the agency;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 29A-5-4(g) (2021); *accord* W. Va. Code § 16B-2-2(c) (2024) (designating West Virginia Code § 29A-5-4 as governing standard of review for Board of Review appeals). "The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996). Although findings and decisions are entitled to considerable deference, reviewing courts are not required to "rubber stamp" agency determinations, "even when credibility assessments are at issue." *Id.* at 447, 473 S.E.2d at 488. In reviewing agency decisions, courts must determine not just whether the decision is supported by "substantial evidence," but "whether its findings and conclusions were adequately explained." *Id.* at 446, 473 S.E.2d at 487. On appeal, the agency's conclusions of law and application of law to the facts are reviewed de novo. Syl. Pt. 1, *Cahill v. Mercer Cnty. Bd. of Educ.*, 208 W. Va. 177, 539 S.E.2d 437 (2000). With this standard in mind, we consider the issues raised on appeal.

We are presented with two assignments of error to consider on appeal.[7] First, J.D. argues that the Board's denial of his IDDW application was arbitrary, capricious, and clearly wrong because it was based upon the requirement of a Level 3 Autism Spectrum Disorder diagnosis when no such policy has been approved by CMS. Instead, Chapter 513 clearly states that an Autism diagnosis can constitute a "severe and chronic disability," and, J.D.'s Level 2 diagnosis, in light of his symptoms, meets IDDW's eligibility requirements. As a final point, J.D. argues that the Code of Federal Regulations prohibits the retroactive application of changes to IDDW programs if that change is substantive. 42 C.F.R. §

---

[7] We decline to address J.D.'s third assignment of error, which requests this Court to make a factual determination that he met the eligibility criteria for a diagnosis of an intellectual disability below. "An appellate court does not reweigh the evidence[.]" *State v. Thompson*, 220 W. Va. 246, 254, 647 S.E.2d 526, 534 (2007) (per curiam); *Coles v. Century Aluminum of W. Va.*, No. 23-ICA-81, 2023 WL 7202966, at *2 (W. Va. Ct. App. Nov. 1, 2023) (memorandum decision) (noting that an appellate court will not reweigh the evidence presented below on appeal). Moreover, this is a factual determination that the Board, as trier of fact, will have to address as part of its ruling on remand.

441.304(d) (2014).[8] Therefore, a policy requiring a Level 3 diagnosis is a substantive change and cannot be relied upon by the Board to deny J.D.'s application. Conversely, BMS' overarching argument is that its decision must be entitled to deference. Upon review, we agree with J.D. that the Board erred by applying a non-existent policy requirement to deny his application.

It is abundantly clear from Ms. Linton's testimony that the requirement of a Level 3 Autism Spectrum Disorder is part of a policy which is pending approval by CMS. Likewise, there is no language in the 2024 version of Chapter 513 implementing such a change. Instead, under Chapter 513,[9] there is no controlling language which reflects a requirement for any specific level for an Autism diagnosis to qualify for the purposes of IDDW diagnosis eligibility. Instead, Chapter 513 § 513.6.2.1 states that an applicant is required to have a diagnosis of a "related condition which constitutes a severe and chronic disability" and lists Autism diagnosis as one of the conditions that "may, if severe and chronic in nature" qualify an application for the IDDW program.

Thus, the issue before the Board was not the level of J.D.'s diagnosis, but whether his diagnosis constituted a "severe and chronic disability." Here, the record indicates that at least one of J.D.'s IPEs found that he exhibited severe autism symptoms. Critically, the Board failed to analyze the record and decide this case based upon the existing diagnosis policy language of Chapter 513, which makes no requirement for a Level 3 or any other level of diagnosis. As such, the Board's reliance upon Ms. Linton's testimony and application of a non-existent requirement of a Level 3 diagnosis was arbitrary, capricious, and clearly wrong. Therefore, we reverse the Board's decision and remand the matter for

[8] This regulation states:

(d) The agency may request that waiver modifications be made effective retroactive to the first day of a waiver year, or another date after the first day of a waiver year, in which the amendment is submitted, unless the amendment involves substantive changes as determined by CMS.
(1) Substantive changes include, but are not limited to, revisions to services available under the waiver including elimination or reduction of services, or reduction in the scope, amount, and duration of any service, a change in the qualifications of service providers, changes in rate methodology or a constriction in the eligible population.
(2) A request for an amendment that involves a substantive change as determined by CMS, may only take effect on or after the date when the amendment is approved by CMS, and must be accompanied by information on how the State has assured smooth transitions and minimal effect on individuals adversely impacted by the change.

[9] *See* n.3, *supra*.

further consideration and issuance of a new decision containing detailed findings, analysis, and conclusions based upon the express policy language of Chapter 513.

As his final assignment of error, J.D. argues that his due process rights were violated when the BMS-approved psychologist performing his second IPE relied upon the results from his IPE-1 and failed to conduct a proper independent evaluation of him with respect to his IDDW application. On this issue, BMS contends that this issue was not raised below, J.D.'s mother chose her evaluator from the BMS-approved list, and both evaluations found J.D.'s autism to be severe. Therefore, BMS maintains there is no evidence J.D.'s procedural rights were violated. We disagree.

In his testimony before the Board, Dr. Scotti raised concerns regarding the administration of testing for IPE-2, and the Board's decision references such concerns in its summation of Dr. Scotti's testimony. Thus, the issue is ripe for our consideration on appeal. Pursuant to Chapter 513 § 513.6.1.1 (2023): "The IPE is utilized by MECA to make a medical eligibility determination." In that respect, it is undisputed that BMS uses a list of independent psychologists who are trained by MECA to perform "comprehensive psychological evaluations independent of IDDW providers[.]" Independent Psychologist, *Glossary, Chapter 513* (2013). However, in this case, we conclude that J.D. was not afforded a comprehensive second IPE. Instead, it is uncontroverted that the independent psychologist performing IPE-2 used J.D.'s diagnostic testing results from IPE-1 and did not perform independent diagnostic testing. Given the lack of independent testing, coupled with the significant role an IPE plays in an applicant's IDDW application, we vacate IPE-2 and remand the matter for J.D. to undergo a new comprehensive second IPE in accordance with the requirements of Chapter 513.

Based on the foregoing, the Board's decision is reversed, the IPE-2 is vacated, and the matter is remanded for further proceedings consistent with this decision.

Reversed, in part, Vacated, in part, and Remanded.

**ISSUED:** December 23, 2024

**CONCURRED IN BY:**

Chief Judge Thomas E. Scarr
Judge Charles O. Lorensen
Judge Daniel W. Greear