# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**
**February 27, 2026**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**IVY O'NEAL,**
**Grievant Below, Petitioner**

**v.)   No. 25-ICA-169**       (Bd. of Review No. 24-BOR-3639)

**WEST VIRGINIA OFFICE OF HEALTH**
**FACILITY LICENSURE AND CERTIFICATION,**
**Respondent Below, Respondent**


## MEMORANDUM DECISION

Petitioner Ivy O'Neal appeals the March 25, 2025, order of the West Virginia Office of Inspector General Board of Review ("Board"). Respondent West Virginia Office of Health Facility Licensure and Certification ("OHFLAC") filed its response.[1] No reply was filed. The issue on appeal is whether the Board erred in upholding the OHFLAC Long-Term Care Nurse Aide Program's substantiation of verbal abuse of a patient by Ms. O'Neal and in ordering the Nurse Aide Program to place Ms. O'Neal's name on the Nurse Aide Abuse and Neglect Registry.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the Board's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

This case arises from allegations that Ms. O'Neal, a Registered Long-Term Care Nurse Aide, verbally abused W.N.,[2] an incapacitated resident of the long-term care facility at Roane General Hospital in Spencer, West Virginia, on January 15, 2024. A complaint

---

[1] Ms. O'Neal is represented by Todd W. Reed, Esq. OHFLAC is represented by Attorney General John B. McCuskey, Esq., and Assistant Attorney General James "Jake" Wegman, Esq.

[2] Consistent with our practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In Re K.H.*, 235 W. Va. 254, 256 n.1, 773 S.E.2d 20, 22 n.1 (2015).

was made to the OHFLAC Nurse Aide Program[3] that around 4:00 a.m. that day, Ms. O'Neal verbally and physically abused W.N. while she was in her care.

During her overnight shift on January 14-15, 2024, Ms. O'Neal provided care for W.N., a ninety-six-year-old female patient with dementia, Alzheimer's disease, aphasia, and blindness. W.N. required assistance with activities of daily living, including dressing, eating, hygiene, bathing, and toileting, and was unable to make any of her own healthcare decisions. W.N. was described as mostly non-verbal but would sometimes count aloud and hum. She was also known to be combative with staff when they attempted to assist her. W.N.'s care plans contained multiple notes directing her caregivers to explain her care in advance and not rush, and advising that she "has a potential for behaviors related to dementia and history of anxiety as evidenced by resistance to care . . . If resident displays verbal or physical aggression, give her some space and attempt care at later time." Another care plan note recommended, "Give resident item to hold such as wash cloth to assist with minimizing her grabbing at others."

At the time of the incident in question, Ms. O'Neal was in W.N.'s room and needed help to care for W.N. after the patient had an incontinent event. Ms. O'Neal turned on the room's call light to signal to the nurse's desk that she needed assistance. Ms. O'Neal testified she waited for what felt "like thirty minutes" until another Nurse Aide, Shannon Webb, arrived and Ms. O'Neal asked Nurse Aide Webb to get a fresh gown and clean linens for W.N.

Nurse Aide Webb later testified that she stepped out of the room to retrieve the items and when she returned, she observed that Ms. O'Neal seemed "aggravated" as she said aloud that W.N. was "getting on her fucking nerves" and that she was "tired of this damn shit." Nurse Aide Webb also observed Ms. O'Neal handling W.N.'s wrists and arms roughly as they were changing her gown and bed linens and that Ms. O'Neal told W.N. she was going to put a bag over her head and roll her out of the bed. Nurse Aide Webb testified that W.N. was not being combative or uncooperative; rather W.N. was counting aloud, as she often did. When W.N. counted to number fifty-five, Nurse Aide Webb heard Ms. O'Neal say, "I'm going to fifty-five you in a minute." Nurse Aide Webb later testified that Ms. O'Neal did not provide care "like a CNA should."

---

[3] The Nurse Aide Program is responsible for the oversight of the nurse aide training and competency evaluation programs throughout West Virginia and maintains the Nurse Aide Registries, including the Nurse Aide Abuse and Neglect Registry, pursuant to West Virginia Code of State Rules § 69-6-2.11 (2015). This legislative rule series was later amended to reflect the reorganization of the West Virginia Department of Health Services, and the current version is found under the Office of Inspector General at West Virginia Code of State Rules § 71-18-2.11 (2025). However, the prior version was in effect during the events relevant to this appeal.

Licensed Practical Nurse Clarissa Harper also responded to the call light, although she stated she arrived at W.N.'s room after Nurse Aide Webb was already in the room assisting Ms. O'Neal. She stated she paused outside the room for a moment, where the privacy curtain had been pulled closed, and could hear Ms. O'Neal yelling profanities. LPN Harper entered and asked if everything was okay, and Ms. O'Neal said yes. The three women finished the necessary tasks in W.N.'s room and left. About twenty minutes later, Nurse Aide Webb reported to LPN Harper that she had witnessed Ms. O'Neal threatening to put a bag over W.N.'s head and roll her onto the floor and that Ms. O'Neal was very rough with W.N. while providing care.

Soon thereafter, LPN Harper and Nurse Aide Webb telephoned the facility's Director of Nursing ("DON"), Alisha Wilson, RN, and reported Ms. O'Neal's conduct. DON Wilson came into work early that morning to interview LPN Harper and Nurse Aide Webb before they left after their midnight shift ended, and notified the facility's social worker, Melody Sotomayor, to file the required complaint with the Nurse Aide Program. Ms. O'Neal was instructed not to return to work pending an investigation of the allegations.

As part of the facility's investigation of the allegations against Ms. O'Neal, Dawn Jett, RN, performed a full body skin assessment of W.N. at 10:15 a.m. on January 15, 2024. Nurse Jett found and documented three new bruised areas on W.N.'s arms,[4] but noted no signs of pain or discomfort and found no need for medical treatment. Nurse Jett also noted that W.N. was known to be combative during care, wandered independently in her wheelchair, and had an order for protective sleeves but she did not like to wear them. The facility continued to investigate the allegations against Ms. O'Neal and filed the required Five-Day Follow-Up Report with the Nurse Aide Registry reflecting that the allegations of verbal abuse were substantiated, but, after careful consideration of W.N.'s history, the allegation of physical abuse was determined to be inconclusive. The facility terminated Ms. O'Neal's employment on January 17, 2024.

OHFLAC Surveyor Kathy Ball, RN, conducted a separate investigation of the incident in August of 2024, and prepared the Nurse Aide Program's Investigation Report dated September 26, 2024. She interviewed Ms. O'Neal, LPN Harper, Nurse Aide Webb, DON Wilson, and Social Worker Sotomayor, and reviewed records relating to Ms. O'Neal's training and credentials, W.N.'s diagnoses and findings related to her lack of capacity, the facility's patient census and staffing assignments on January 15, 2024, and the facility's investigative records.

According to Surveyor Ball's report, Social Worker Sotomayor stated that when she interviewed Ms. O'Neal shortly after the incident, Ms. O'Neal denied being abusive to W.N. and asserted that W.N. was combative during care. Surveyor Ball's report also

---

[4] The assessment also documented a bruise that had been reported by Ms. O'Neal on January 14, 2024, one day earlier.

characterized Ms. O'Neal as appearing to be angry during her interview and stated, "[s]he sat down in a chair across from this surveyor with arms cross over her chest and just glared at this surveyor for several minutes." When asked if she could recall what happened during the incident in question, Ms. O'Neal responded, "I plead the fifth." When Surveyor Ball told her that refusing to cooperate with the investigation could mean placement on the Nurse Aide Abuse and Neglect Registry, Ms. O'Neal said, "I don't even know what I am accused of!" Surveyor Ball read a report of the allegations to Ms. O'Neal and Ms. O'Neal denied using profanities and making threats to put a bag on W.N.'s head or roll her out of bed onto the floor. Ms. O'Neal repeatedly asserted that W.N. physically hurt her – that W.N. always grabbed her wrists and twisted them, scratched her, and tried to bite her, and Ms. O'Neal thought no one at the facility cared about that. Ms. O'Neal also pointed out that she had just reported a large bruise on W.N.'s upper left arm the day before this incident occurred, but Surveyor Ball informed her that new bruises were also found on W.N. the morning after the abuse allegations were made.

Surveyor Ball's report concluded that she would recommend to the OHFLAC Nurse Aide Program that Ms. O'Neal be placed on the Nurse Aide Registry for abuse. Surveyor Ball's recommendation was based on the facility's decision to terminate Ms. O'Neal after substantiating the abuse allegation, and Ms. O'Neal's angry and defensive demeanor during her interview. Glora Crouch, the Nurse Aide Program Manager, notified Ms. O'Neal by letter dated November 1, 2024, that the Nurse Aide Program determined that the allegation of abuse against her had been substantiated and that it intended to place her name on the Nurse Aide Abuse and Neglect Registry. In response, on November 12, 2024, Ms. O'Neal requested a hearing before the Board.

The Board's Administrative Law Judge ("ALJ") conducted the hearing by videoconference on February 12, 2025. LPN Harper and Nurse Aide Webb testified regarding Ms. O'Neal's abusive conduct that they witnessed on January 15, 2024. DON Wilson testified that she interviewed the complaining staff members and Ms. O'Neal, who denied the allegations and said that she had a "regular conversation" with W.N. that night. DON Wilson testified that she found the witnesses' statements more credible than Ms. O'Neal's, and that Ms. O'Neal was terminated because her comments to W.N. constituted verbal abuse of a resident.[5] The ALJ also heard testimony from OHFLAC Surveyor Pamela

---

[5] Under the Nurse Aide Abuse and Neglect Registry Rule, verbal abuse is defined as:

> The use of oral, written or gestured language that willfully includes disparaging and derogatory terms to residents or their families, or within their hearing distance, regardless of their age, ability to comprehend, or disability. Examples of verbal abuse include, but are not limited to, threats of harm; saying things to frighten a resident; intimidation; humiliation; threats of hostility, or vulgarity.

Huff regarding the definition of abuse under the Nurse Aide Rule and an explanation as to how Ms. O'Neal's conduct met that definition.

Ms. O'Neal appeared at the hearing telephonically[6] and denied LPN Harper and Nurse Aide Webb's allegations but provided no explanation or evidence to refute the eyewitness statements against her. The ALJ found that Ms. O'Neal "unconvincingly denie[d] that she said any of the statements attributed to her[,]" and concluded that her argument was "not credible or supported by the reliable evidence presented." The ALJ further concluded that the reliable evidence presented supported a finding that Ms. O'Neal was "aggravated and directed demeaning and derogatory statements towards W.N." The ALJ concluded that the OHFLAC Nurse Aide Program proved by a preponderance of the evidence that Ms. O'Neal used oral language within W.N.'s hearing distance that willfully included disparaging and derogatory terms. The ALJ further found that Ms. O'Neal willfully intimidated and threatened W.N. and engaged in verbal intimidation and vulgarity through her statements to her patient.

Accordingly, the March 25, 2025, decision of the Board upheld the Nurse Aide Program's decision to substantiate verbal abuse by Ms. O'Neal against W.N. and affirmed her placement on the Nurse Aide Abuse and Neglect Registry.

It is from this order that Ms. O'Neal now appeals. The West Virginia Administrative Procedures Act sets forth the standard of judicial review by this Court as follows:

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency;
> (3) Made upon unlawful procedures;
> (4) Affected by other error of law;
> (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code State R. § 69-6-2.17 (2015).

[6] According to the hearing transcript, Ms. O'Neal attempted but was unable to connect by video conferencing.

W. Va. Code § 29A-5-4(g) (2021); *see also* W. Va. Code R. § 69-6-8 (2015) (Nurse Aide Abuse and Neglect Registry hearings before the Board are held in accordance with Administrative Procedures Act and with the Department of Health and Human Resources rule, Rules for Hearings under the Administrative Procedures Act § 69-1-1 (2015)).

On appeal, Ms. O'Neal asserts one assignment of error. She claims that the Board erred by finding her hearing testimony "unconvincing" when she denied the allegations of abuse. Ms. O'Neal argues that the ALJ misjudged her credibility because of her flat affect and unemotional, monosyllabic style of speaking rather than fairly considering the substance of her statements. Accordingly, Ms. O'Neal asserts that the ALJ made an adverse credibility finding based on her demeanor, and that this was particularly prejudicial because she appeared by telephone for a video hearing, which could have further distorted the ALJ's perception of her testimony.

Ms. O'Neal acknowledges that the ALJ has the duty to make witness credibility determinations, which permits him to assess witness demeanor and the plausibility of the proffered testimony, among other factors. However, she asserts that demeanor evidence is not an infallible indicator for assessing credibility, and in her case, it led to an unfair and incorrect finding of verbal abuse. Further, Ms. O'Neal argues that the statements and testimony of LPN Harper and Nurse Aide Webb should have been judged to be less credible than hers because their stories were the result of a collaborative effort between the two women who spoke to each other after the event, called their supervisor together to report it, and then retold their story to the supervisor again when she came to the facility later that morning. Ms. O'Neal suggests that eyewitnesses usually interpret a shared event differently based on their unique perspectives, but LPN Harper and Nurse Aide Webb gave identical accounts of Ms. O'Neal's alleged conduct, which indicates collusion. For these reasons, Ms. O'Neal submits that the ALJ's credibility determination should not be afforded deference, and the March 25, 2025, order should be reversed.

Upon review, we disagree and find no merit in these contentions. At the outset, we dispose of Ms. O'Neal's unsupported allegation that the ALJ improperly considered "demeanor evidence" such as Ms. O'Neal's flat affect or style of speaking. We find the order on appeal is devoid of any reference to Ms. O'Neal's demeanor, affect, speech pattern, or style. Instead, it includes findings that she "unconvincingly denies that she said any of the statements attributed to her" and that her "blanket denial of all details and allegations is a persuasive factor in assessing her credibility regarding the events." Without more, we cannot assume or infer that Ms. O'Neal's demeanor was a factor in the ALJ's credibility determination. Ms. O'Neal's argument on this point is purely speculative and, therefore, must fail.

Moreover, we find no basis to disturb the ALJ's credibility determinations regarding LPN Harper or Nurse Aide Webb. It is well-established that "[a]n appellate court does not reweigh the evidence[.]" *State v. Thompson*, 220 W. Va. 246, 254, 647 S.E.2d 526, 534

(2007); *Coles v. Century Aluminum of W. Va.*, No. 23-ICA-81, 2023 WL 7202966, at *2 (W. Va. Ct. App. Nov. 1, 2023) (memorandum decision). "We must uphold any of the ALJ's factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts. Further, the ALJ's credibility determinations are binding unless patently without basis in the record." *Martin v. Randolph Cnty. Bd. of Educ.*, 195 W. Va. 297, 304, 465 S.E.2d 399, 406 (1995); *see also Rainey v. W. Va. Dept. of Health and Hum. Res./OHFLAC*, No. 14-0536, 2015 WL 2364571 (May 15, 2015) (memorandum decision) (affirming placement on Nurse Aide Abuse Registry after deferring to credibility determinations made by hearing examiner).

Upon review, the ALJ's credibility determinations are clearly supported by the record. LPN Harper and Nurse Aide Webb each gave written statements and testified in detail regarding their independent observations of Ms. O'Neal's conduct constituting verbal abuse against W.N. on January 15, 2024. The ALJ considered their testimony and noted that both eyewitnesses "convincingly testified at the hearing." The order contains additional findings that LPN Harper and Nurse Aide Webb's statements were not identical, and that there were "no occurrences that reasonably indicate untruthfulness or collusion of these witnesses." Furthermore, the ALJ concluded that there was "no indication of malice or motive for the assertions of untruthfulness or collusion." Ms. O'Neal failed to enter any evidence of collusion into the record, or any other evidence that would tend to discredit either eyewitness. Therefore, in light of our deferential standard, we cannot find that the ALJ's credibility determinations regarding LPN Harper or Nurse Aide Webb were clearly wrong.

Accordingly, for the foregoing reasons, we affirm the Board's March 25, 2025, order.

Affirmed.

**ISSUED:** February 27, 2026

**CONCURRED IN BY:**

Chief Judge Daniel W. Greear
Judge Charles O. Lorensen
Judge S. Ryan White